IN RE DARNELL JONES.

(No. 49766 — Decided
December 16, 1985.)

*Andrew D. Bemer, Jr.,* and *Carl LoPresti,* for appellee Cuyahoga County Welfare Dept.

*Scott R. Mergenthaler,* for appellant Yvette Jones.

*Douglas Baker,* guardian ad litem for Darnell Jones.

JACKSON, J. Appellant herein, Yvette Jones, appeals from an order of the juvenile court granting permanent custody of Darnell Jones to the Cuyahoga County Welfare Department.

The record discloses the following factual background.

In 1977, appellant gave birth to Darnell Jones. At that time, she was sixteen years old and in the custody of the Ohio Youth Commission. The paternity of the child was never established. In July 1977, Darnell was adjudged dependent, committed to the temporary custody of the welfare department, and placed in the Metzenbaum Children's Center for the first year of his life. He was subsequently placed in a foster home until he was four years old.

In the meantime, appellant had completed high school and a vocational training course, and had obtained satisfactory living accommodations. Based on appellant's progress, the welfare department permitted her to take Darnell into her home in May 1981. Appellant discovered that Darnell would respond to stressful situations by wetting his pants. She believed that he was deliberately provoking her, and responded by beating him.

On August 17, 1981, it was necessary for Darnell to be admitted to the hospital after appellant had severely whipped him using a belt and belt buckle. An attending physician summarized Darnell's injuries, as follows:

"Multiple linear abrasions below right eye, left cheek, neck, all 4 extremities, forehead and neck. Bruises present 2 inches left forehead, and all 4 ext., especially left arm and forearm where they are confluent especially over a swollen left hand and left index finger. Small bruise on right scrotum. Right tympanic membrane and anterior perforation consistent with trauma. Right eye was myopic but not bleeding. X-rays revealed linear fracture of proximal left index finger."

The incident triggered an angry physical confrontation between appellant and her caseworker. As a result, the caseworker requested re-assignment.

Darnell remained in the hospital for twelve days. Upon his discharge, on August 28, 1981, the welfare department placed him with a foster parent, Mrs. Stubbs.

Shortly after Darnell went to live with Mrs. Stubbs, appellant became pregnant again. In preparation for the new baby's arrival, Yvette sought and

received counseling from Patricia File, a county psychiatric caseworker. On May 12, 1982, the child, Carleton Jones, was born. On July 23, 1982, Carleton Jones died of acute respiratory infection with acute laryngitis.

After the death of Carleton, Yvette resumed her efforts to regain custody of Darnell. A comprehensive reunification plan ("CRP") had been filed with the juvenile court on May 12, 1982. Appellant was instructed to work with her new social worker, Carole Diamond, to accomplish the following goals of the CRP:

"Mother must resolve conflicts between herself and child, and her boyfriend and child. Must assume responsibility for her part in child's emotional problems, needs, and fear of her.

"Mother must: See that the abuse of child was not child's problem, but hers — able to manage a child w/o physical abuse — accept responsibility of parenting w/o MGM [maternal grandmother]."

Appellant obtained psychiatric counseling from Patricia File, who was impressed with appellant's progress. However, appellant refused to attend classes for abusive parents, because she felt that they did not apply to her. Moreover, appellant did not develop a working relationship with the social worker, Carole Diamond, because she believed that the caseworker was not open-minded enough.[1] As a result, the social worker was not persuaded that progress toward the reunification goals was made.

Concurrently, Darnell was in therapy and under psychiatric observation. Darnell exhibited great fear of appellant, but showed some overall improvement in the environment of Mrs. Stubbs' foster home. The mental health professionals who dealt with Darnell's case advised against any contact between Dar-

nell and appellant. Darnell likewise did not wish to see appellant. There was no visitation.

Eventually, Mrs. Stubbs apparently expressed[2] some interest in adopting Darnell, and the county filed a motion requesting permanent custody. See R.C. 2151.413. Appellant filed a memorandum in opposition to the county's motion, and later filed her own motion for permanent custody.

The juvenile court heard both motions simultaneously on August 29, November 7, and November 20, 1984. At the close of all the evidence, the court denied appellant's motion for permanent custody and granted the county's motion. The order of the trial court divested appellant of all parental rights in Darnell.

On appeal to this court, appellant Yvette Jones assigns two errors for our review.

I

In appellant's first assigned error she contends:

"The trial court erred to the prejudice of appellant, Yvette Jones, where it failed to bifurcate the permanent custody hearing proceedings into separate adjudicatory and dispositional stages and permitted testimony as to the best interests of the child to enter into what was apparently the adjudicatory portion."

A

Appellant cites the case of *In re Vickers Children* (1983), 14 Ohio App. 3d 201, for the proposition that hearings for permanent custody must be bifurcated into separate adjudicatory and dispositional stages, and that failure to bifurcate is prejudicial error.

The applicable statute governing hearings on motions for permanent

---

[1] The record does not disclose that appellant filed objections to the CRP, see R.C.

2151.412(C), or proposed modifications, see R.C. 2151.412(E).

[2] Mrs. Stubbs was not called to testify.

custody is R.C. 2151.414, effective as of October 24, 1980.[3]

The *Vickers* court acknowledged that the statutory scheme "appears to provide for a single hearing in cases involving a motion for permanent custody filed by a 'county department, board, or certified organization.' " *Vickers, supra,* at 203. However, that court went on to declare that the statutes cannot be controlling because the Juvenile Rules require separate adjudicatory and dispositional hearings. See Juv. R. 29 and 34.

Despite the great esteem held by this court for our colleagues in the Twelfth Appellate District, we cannot agree with their conclusion on this particular issue.

We agree, of course, that in instances of procedural conflict, the rules must control over an inconsistent statutory provision. However, we do not perceive such a conflict in the case at bar.

Juv. R. 29 ("adjudicatory hearing") prescribes procedures to be followed by the court after a complaint is filed, including notice requirements, entry of admissions or denials, and the determination of whether the child is delinquent, unruly, dependent, neglected, or abused.

After completion of the adjudicatory stage, the court will, if necessary, conduct a dispositional hearing. See Juv. R. 34. In the case of a child who has been adjudicated dependent, neglected, or abused, several possible dispositions are available to the court. See. R.C. 2151. 353(A).

By contrast, however, in the case at bar, there is no dispositional option. Either the motion is granted, in which case the mother's parental rights are terminated, or else the motion is denied. The single hearing prescribed by R.C. 2151.414 is purely adjudicatory. The foregoing analysis is consistent with Juv. R. 2(1), which states:

" '*Adjudicatory hearing*' *means a hearing to determine* whether a child is a juvenile traffic offender, delinquent, unruly, neglected, or dependent or otherwise within the jurisdiction of the court or *whether temporary legal custody should be converted to permanent custody.*"[4] (Emphasis added.)

Consequently, this court holds that the juvenile court did not err in failing to bifurcate the permanent custody hearing into separate adjudicatory and dispositional stages.

### B

As an alternative holding on appellant's first assignment of error, we note that appellant failed to object to the allegedly improper evidence, thus waiving her right to raise the issue on appeal. See Evid. R. 103(A)(1); *State* v. *Glaros* (1960), 170 Ohio St. 471 [11 O.O.2d 215]; accord *Vickers, supra.*

Appellant's first assignment of error is overruled.

### II

Appellant's second assigned error charges error as follows:

"The trial court * * * [erred] in awarding permanent custody of her minor son to the Cuyahoga County Department of Welfare, Division of Social Services where the requirements of Ohio Revised Code § 2151.414 were not proven by clear and convincing evidence."

---

[3] The Supreme Court's decision in *In re Cunningham* (1979), 59 Ohio St. 2d 100 [13 O.O.3d 78], was rendered prior to the effective date of R.C. 2151.414.

[4] The case of *In re Baby Girl Baxter* (1985), 17 Ohio St. 3d 229, was not cited by any party to this appeal. *Baxter* is distinguishable, in any event, because the trial court therein acted on an original complaint. *Baxter* did not involve an R.C. 2151.414 motion to convert temporary custody to permanent custody.

Before temporary custody can be converted to permanent custody, R.C. 2151.414 requires a court to examine the factors listed in R.C. 2151.414(A)(1) through (3). The gist of appellant's second assignment of error is that the juvenile court could not have determined, based on clear and convincing evidence, that "the county department, board, or certified organization has made a good faith effort to implement the initial and comprehensive reunification plans [CRP] for the child that were approved by the court pursuant to section 2151.412 of the Revised Code; * * *" R.C. 2151.414(A)(1). Appellant argues that, because no visitation was allowed after August 17, 1981, there could not have been a good faith effort to reunite her with Darnell.

Under the heading "Visitation Schedule," the CRP provided as follows:

"Visitation with the children [*sic*] in placement has not begun. Child refuses to see mo. [mother], demonstrates great fear. Awaiting recommendations of child's therapist as to whether visitation will be harmful to child. Mo. is aware of this problem."[5]

The mental health professionals who examined Darnell concluded that forced visitation with Yvette would be deleterious to Darnell's mental and emotional health.

Ordinarily, a CRP must include "regular and frequent visitation and communication or other contact between the parents and child * * *." R.C. 2151.412(B)(1)(b)(i), incorporated by reference, R.C. 2151.412(D)(4). However, this court has held that in exceptional cases it is within the discretion of the juvenile court to deny visitation. *In re Espy* (July 22, 1982), Cuyahoga App. Nos. 44202 to 44204, unreported.

In the case at bar, the juvenile court, relying on the testimony of therapists and psychologists, and on Darnell's own wishes,[6] found that the denial of visitation was justified. We agree. The second assignment of error is overruled.

Accordingly, the judgment of the juvenile court is affirmed.

*Judgment affirmed.*

PRYATEL, J., concurs.

PARRINO, C.J., concurs in judgment only.

Appendix

"THE COURT: What do you think about that?

"DARNELL JONES: I think that I don't want to go back. I want to stay with my foster mother.

"THE COURT: What's her name?

"DARNELL JONES: Mrs. Stubbs.

"THE COURT: What's her name?

"DARNELL JONES: Mrs. Stubbs.

"THE COURT: How long have you been with her?

"DARNELL JONES: 4 months.

"THE COURT: 4 months?

"DARNELL JONES: Yes.

"THE COURT: How old were you when you went there?

"DARNELL JONES: 4.

"THE COURT: And how old are you now?

"DARNELL JONES: 7.

"THE COURT: How long would that be? Three years would it be?

"DARNELL JONES: Yes.

"THE COURT: Who's in that household?

"DARNELL JONES: My brother

---

[5] As noted in footnote 1, *supra*, Yvette did not object to the plan or propose modifications.

[6] See Appendix at 180-181, excerpts of *in camera* interview between the juvenile court judge and Darnell Jones.

Johnny, me, and two babies and my two little brothers.

"THE COURT: You mentioned Yvette. Does anybody talk to you about her? Why do you think you would rather stay in the foster home?

"DARNELL JONES: Because I don't want to go back to Yvette.

"THE COURT: Why? Can you tell me?

"DARNELL JONES: I'm scared.

"THE COURT: Can you tell me what you're scared about Darnell?

"DARNELL JONES: I'm scared and I don't want to go back there.
"* * *

"THE COURT: Did anybody tell you what to tell me?

"DARNELL JONES: No.
"* * *

"THE COURT: What's in here?
"DARNELL JONES: My milk.

"THE COURT: Did you drink it all? Were you scared to come down today?

"DARNELL JONES: A little bit.

"THE COURT: What did you think would happen?

"DARNELL JONES: I thought that I would be in here with Yvette.

"THE COURT: Well, are you still scared?

"DARNELL JONES: No.
"* * *

"THE COURT: Who brought you down, do you know?

"DARNELL JONES: Ms. Diamond did.

"THE COURT: Did anybody else come with you?

"DARNELL JONES: My mother.

"THE COURT: Oh, your mother's with you?

"DARNELL JONES: Yes.

"THE COURT: What did you say your mother's name was?

"DARNELL JONES: Mrs. Stubbs."
(Tr. 77-79.)