[Cite as *In re J.H.*, 2016-Ohio-640.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY


| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| | | CASE NOS. CA2015-07-014 |
| J.H., et al., | : | CA2015-07-015 |
| | : | O P I N I O N |
| | | 2/22/2016 |
| | : | |
| | : | |


APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 20133051


Kim Vandervort, 555 Todds Ridge Road, Wilmington, Ohio 45177, Guardian Ad Litem

Lynn W. Turner, P.O. Box 385, Hillsboro, Ohio 45133, for appellant, C.H.

Susan Zurface-Daniels, P.O. Box 589, 100 South High Street, Suite 204, Hillsboro, Ohio 45133, for appellant, H.S.

Richard W. Moyer, 103 East Main Street, Wilmington, Ohio 45177, for appellee

William Chad Randolph, P.O. Box 568, 1025 South South Street, Suite 400, Wilmington, Ohio 45177, for appellee


**M. POWELL, P.J.**

{¶ 1} Appellants appeal a decision of the Clinton County Court of Common Pleas, Juvenile Division, granting permanent custody of J.H. and E.H. to a children's services agency. For the reasons stated below, we affirm.

{¶ 2} Mother and father are the parents of two young boys, J.H. and E.H. In February 2013, Clinton County Children Services ("agency") began providing supportive services to the family following a report the children were locked in their bedroom while mother and father were smoking marijuana. During this time, the agency caseworker noticed that the family's apartment was filthy and bug-infested. The agency's case closed in May 2013 after the situation had improved and mother began mental health treatment and initiated services for the children.

{¶ 3} However, on July 1, 2013, the juvenile court ordered J.H. and E.H. placed in the emergency custody of the agency after the conditions of the home reverted to a state similar to that prompting agency intervention in February 2013. The apartment was observed to be filthy, infested with bugs, and extremely hot. The children were observed with roaches crawling on them and had what appeared to be feces smeared on their faces. Mother suffers from chronic major depressive disorder and an anxiety disorder. Mother's depression at this time was severe. Mother reported not being able to get out of bed and wanting to harm herself. Father was also diagnosed with an anxiety disorder. Both parents were unemployed at this time. In granting emergency custody of the children to the agency, the juvenile court found that the agency had made reasonable efforts to avoid removal of the children from their home.

{¶ 4} On July 2, 2013, the agency filed a complaint in the juvenile court alleging the children to be dependent, neglected, and abused. On August 26, 2013, by agreement of the parties, J.H. and E.H. were adjudicated neglected, ordered to remain in the agency's temporary custody, and the allegations of dependency and abuse were dismissed. By dispositional order of September 23, 2013, the children were placed in the temporary custody of the agency. Once again, in ordering the children placed in the custody of the agency, the juvenile court found that the agency had used reasonable efforts to avoid the children's

continued placement outside of their home. The juvenile court also approved a case plan for the family with a permanency goal of reunification. Case plan services included that mother and father maintain safe and appropriate housing for at least three months; maintain stable employment for at least three months; obtain mental health assessments and comply with recommendations; participate and complete age appropriate parenting classes; and the children attend all medical and therapy appointments. The parents were also granted two-hour weekly supervised visitation with the children.

{¶ 5} At the time the children were placed in the agency's custody, J.H. was three years old and E.H. was two years old. Both children demonstrated significant developmental delays and traumatic behaviors. Testing revealed that the children were each as much as two years behind developmentally. The children babbled, knew few words, were not potty-trained, and were afraid of bathing. J.H., the oldest child, didn't know how to eat, would not sleep through the night, would scream inconsolably, rock back and forth, and, when bathed, would say bathing "hurts his butt." Despite being three years old, J.H. had an extremely limited vocabulary and essentially only knew how to say "mommy" and "fuck you bitch." J.H. was assessed for autism and it was determined that his sensory issues and developmental delays were the result of severe neglect and not autism. E.H. also exhibited similar delays and fears, including a fear of bathing and diaper changes. E.H.'s few words were "no," "don't hurt me," "baths hurt me" and during diaper changes E.H. would put his hands over his penis and say "don't hurt me, don't hurt me."

{¶ 6} J.H. and E.H. were placed in foster homes. J.H. disrupted two foster placements due to his behaviors. In October 2013, J.H. was placed in his current foster home. E.H.'s initial foster placement also had to be changed and he was placed in his current foster home in August 2013. While in foster care, J.H. began attending speech, occupational, and physical therapy and received an Individualized Education Program ("IEP")

focusing on adaptive behavior goals. E.H. also began receiving speech therapy. Initially, the children made little progress at school and in their therapy appointments. Mother and father attended two speech therapy appointments with each of the children but were asked to stop attending because the children displayed odd behaviors and were unable to focus on the therapy with their parents present.

{¶ 7} On June 9, 2014, the juvenile court conducted an annual review and a hearing on the extension of temporary custody. At the hearing the juvenile court suspended the parents' weekly supervised visitation due to concerns regarding the increase of the children's traumatic behaviors following visits with their parents. These behaviors were described as "inconsolable screaming, self-harming behaviors such as hitting themselves, [and] refusing to have diapers changed * * *." Both foster mothers reported the children "rock," cry, and are inconsolable following visitations. E.H.'s teacher stated E.H. did not focus well after visitations. J.H.'s teacher stated J.H. "screams, runs around the classroom, refuses to have his diaper changed, and hits himself" on days following parental visits. The juvenile court ordered that temporary custody be extended and also made a third reasonable efforts determination.

{¶ 8} The juvenile court held hearings reviewing the suspension of visitation in August, October, and November 2014. At each of the hearings, the caseworker and J.H.'s and E.H.'s foster mothers testified that since the suspension of visitation, the children's behaviors are much improved. J.H. and E.H. have stopped screaming, rocking, and crying, and both are progressing well in potty-training, school, and speech therapy. At the August hearing, the caseworker explained that J.H. was placed on a waiting list for counseling in May 2014 to address his regressive behaviors, but has not yet met with a therapist. The juvenile court continued the suspension of visitation at the August hearing and also at the October hearing pending testimony from J.H.'s therapist regarding reunification with mother and

father.

{¶ 9} At the November 2014 hearing, J.H.'s therapist testified that he does not support reinstating visitation. He explained that J.H. has post-traumatic stress disorder, his parents are trauma triggers, and his trauma symptoms will increase if he is reintroduced to his parents. However, he testified that he could not state with professional certainty that the children's behaviors were not the result of separation from mother. The juvenile court continued the suspension of visitation.

{¶ 10} On November 20, 2014, the agency filed its motion for permanent custody of J.H. and E.H. Over agency objection, the juvenile court ordered a parental visit to occur in January 2015. Thereafter, mother and father separately filed motions to appoint an expert in child psychology. The juvenile court granted father's motion and appointed Dr. William Kennedy to conduct an independent evaluation of the children and their parents.

{¶ 11} A three-day hearing was held regarding the permanent custody motion in April and May 2015. At the hearing, the foster parents explained that when parental visits were suspended both boys made great progress. J.H. completed his IEP in the first nine weeks of school, his communication had improved, he was successfully potty-trained, he enjoyed bath time, and he stopped rocking back and forth. E.H. also improved greatly, became comfortable taking baths, was potty-trained, and was doing well in school. However, after the January 2015 visit, the behaviors of J.H. and E.H. showed significant regression.

{¶ 12} Specifically, J.H. kicked his foster mother, hit other children in the home, and his speech regressed to babbling and saying "Fuck you, bitch" repeatedly. J.H. regressed so much in school that his previously completed IEP was reinstated. During J.H.'s speech therapy appointment after the January 2015 visit, J.H. answers were "bizarre," he babbled, and at one point in a low growly voice said, "help me in the bedroom, in the bedroom sometimes."

{¶ 13} E.H.'s behavior showed similar regression. On the drive home from the January 2015 visitation, E.H. was rocking, screaming, and kicking and E.H.'s foster mother had to pull the car over to calm him. E.H. also began shoving stuffed animals down his pants and told his foster mother that "these don't hurt me. These are my friends." Further at speech therapy following the visitation, E.H. wet his pants, said nothing for the first ten minutes, and then kept saying he was mad, angry, and hurt. The regressive behaviors of both boys continued for several months.

{¶ 14} The agency caseworker testified that mother and father had made substantial progress and had completed the case plan. Mother regularly attends mental health counseling and both parents attend parenting classes and have obtained subsidized housing. Mother is taking medication for her depression and is taking initiative. The couple's three-bedroom apartment is clean. Father had worked for the past year and mother recently obtained part-time employment.

{¶ 15} Dr. William Kennedy testified that the best environment for J.H. and E.H. is to stay with their current foster family. He explained that it is unclear whether contact with the parents causes the children's regressive behaviors, the behaviors may be mitigated by therapeutic techniques, and that the suspension of visitation was "extremely detrimental" to the prospect of successful reunification. However, while mother and father have made significant progress, if J.H. and E.H. were reunited with their parents it would likely result in "catastrophic levels of stress" and reunification would take years. After the presentation of the evidence, the juvenile court granted the agency's motion, terminated the parents' parental rights for the children, and awarded the agency permanent custody of J.H. and E.H.

{¶ 16} Mother and father now appeal, each asserting two assignments of error.

{¶ 17} Father's Assignment of Error No. 2:

{¶ 18} THE TRIAL COURT ERRED BY TERMINATING THE PARENTAL RIGHTS OF

THE FATHER ABSENT SUFFICIENT CLEAR AND CONVINCING EVIDENCE.

{¶ 19} Mother's Assignment of Error No. 1:

{¶ 20} THE TRIAL COURT'S DECISION TO GRANT PERMANENT CUSTODY WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE BECAUSE THE TOTALITY OF CIRCUMSTANCES SHOWS THAT THE COURT ABUSED ITS DISCRETION IN SUSPENDING THE PARENTS' VISITS, THE AGENCY'S EFFORTS WERE NOT REASONABLE WITH REGARD TO THIS FAMILY, AND THE AGENCY DID NOT SHOW BY CLEAR AND CONVINCING EVIDENCE THAT THE CHILDREN COULD NOT BE REUNIFIED WITH THE PARENTS IN A REASONABLE TIME.

{¶ 21} Before a natural parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. A reviewing court will reverse a finding by the juvenile court that the evidence was clear and convincing only if there is a sufficient conflict in the evidence presented. *Id.*

{¶ 22} Mother and father advance several arguments challenging the juvenile court's decision granting permanent custody of J.H. and E.H. to the agency. We will address these arguments in turn.

**Visitation Rights**

{¶ 23} The parents argue the juvenile court erred in suspending their weekly visitation with the children. An agency's case plan for a child in its temporary custody ordinarily must include "regular and frequent visitation" between parent and child. R.C. 2151.412; Ohio

- 7 -

Adm.Code 5101:2-42-92(A). In determining the frequency of visitation and possible restrictions, agencies are to consider a number of factors, including, the attitudes and feelings between the child and the parent, the child's physical and emotional well-being, the potential harm to the child resulting from the parent's behavior, and the special needs or problems of the child. Ohio Adm.Code 5101:2-42-92(B)(1) and (4). While regular and frequent visitation between children and parents is encouraged, juvenile courts have the discretion to deny visitation in exceptional cases. *In re Adkins Children*, 12th Dist. Butler No. CA89-01-004, 1990 WL 95043, *8 (July 2, 1990); *In re Jones*, 29 Ohio App.3d 176, 180 (8th Dist.1985).

{¶ 24} On appeal, we will not reverse a decision to terminate visitation absent an abuse of discretion. *In re Unger Children*, 5th Dist. Coshocton No. 04 CA 6, 2005-Ohio-2414, ¶ 81. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983).

{¶ 25} Based on all the facts and circumstances presented in this case, the juvenile court did not abuse its discretion in suspending the parents' visitation with J.H. and E.H. We recognize the importance of regular and frequent visitation to achieve reunification; however this case reflects the exceptional circumstances in which the suspension of visitation is appropriate. The evidence demonstrated that the children displayed the regressive behaviors detailed above following visitation with mother and father. At hearings following the initial suspension of visitation, the foster mothers testified that the regressive behaviors of J.H. and E.H. had stopped and the children were progressing well in school, speech therapy, and at home. E.H. and J.H. exhibited behavioral problems at the time they were initially placed. However, after the children spent time in stable foster care environments, their behavioral problems subsided. It was only after the improvement of these behaviors that

time spent with their parents was identified as a potential cause of this behavioral regression. Further, after the juvenile court permitted a visitation to occur between the children and the parents in January 2015, the children's regressive behaviors returned and their progress in school, speech therapy, and in potty-training deteriorated.

{¶ 26} We also are not persuaded that the juvenile court's continuation of the suspension of visitation without expert testimony amounted to an abuse of discretion. J.H.'s therapist's testimony at the November hearing supported the juvenile court's concerns as he testified that J.H. has post-traumatic stress disorder, he was neglected, his parents are trauma "triggers," and he does not support reinstating visitation. *See In re T.S.*, 5th Dist. Tuscarawas No. 11AP110046, 2012-Ohio-2401, ¶ 60 (visitation terminated when children gorged, vomited, and defecated following visits); *Unger Children*, 2005-Ohio-2414, ¶ 83-84 (behavioral problems linked to parent visits). There is nothing to suggest that expert testimony at the June, August, or October 2014 hearings would have supported a different decision as to the suspension of the parents' visitation.

{¶ 27} The evidence relating to the children's regressive behavior, the onset of that behavior in relation to visitation with their parents, and the November 2014 testimony of J.H.'s therapist provides a reasonable basis for the juvenile court's order suspending visitation. Under these circumstances, we do not find that the juvenile court's decision suspending mother's and father's visitation was arbitrary, unreasonable, or unconscionable.

**Reasonable Efforts**

{¶ 28} Mother and father argue the agency did not use reasonable efforts to reunify the family and the juvenile court erred in refusing to allow evidence to be introduced at the permanent custody hearing relevant to the agency's reasonable efforts. The parents acknowledge that a reasonable efforts determination at a permanent custody hearing is unnecessary pursuant to R.C. 2151.419, but maintain, nevertheless, that an agency's

reasonable efforts are relevant under R.C. 2151.413.

{¶ 29} An agency's duty to make reasonable efforts to preserve or reunify a family unit is referred to in various sections of the Ohio Revised Code. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 29. R.C. 2151.419 provides that, but for a few narrowly defined statutory exceptions, the juvenile court must find a children services agency made "reasonable efforts" to reunify a family at hearings involving the adjudication, emergency custody, detention, and disposition for abused, neglected, or dependent children. *C.F.* at ¶ 41. The children services agency has the burden of proving that it made those reasonable efforts. R.C. 2151.419(A)(1). Generally, a juvenile court does not have to make a reasonable efforts determination pursuant to R.C. 2151.419(A)(1) in a permanent custody hearing. *C.F.* at ¶ 41. However, if the agency has not established that reasonable efforts have been made prior to the permanent custody hearing, then it must demonstrate such efforts at that time. *Id.* at ¶ 43.

{¶ 30} In this case, the juvenile court made the reasonable efforts findings as mandated by R.C. 2151.419. The juvenile court found the agency made reasonable efforts to reunify the family when it granted emergency custody to the agency and at the dispositional hearing. The juvenile court also made a reasonable efforts determination at the annual review hearing on June 6, 2014 when parent's visitation rights were suspended.

{¶ 31} During the permanent custody hearing, the juvenile court granted the state's motion to disallow evidence regarding the agency's reasonable efforts to reunify the family. Despite this ruling, evidence relevant to the agency's reasonable efforts was admitted during the hearing. Further in its decision granting permanent custody, the juvenile court also found that the agency had made "reasonable efforts" by providing mother and father counseling, parenting classes, gas cards, and transportation upon request. The court noted that notwithstanding the agency's supportive services of counseling and assessments to the

family from February 2013 until May 2013, the family deteriorated within a month after the agency first closed its case. We find that the record supports the juvenile court's reasonable efforts findings. *See In re K.L.*, 12th Dist. Clermont No. CA2012-08-062, 2013-Ohio-12, ¶ 18 ("'[r]easonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible").

{¶ 32} Mother and father did not, at the time, challenge the reasonable efforts findings made prior to the filing of the permanent custody motion. Mother and father do not argue that the juvenile court failed to comply with R.C. 2151.419. Instead, mother and father argue that the juvenile court erred in not permitting "reasonable efforts" evidence at the permanent custody hearing because the agency did not comply with the reasonable efforts requirement of R.C. 2151.413.

{¶ 33} R.C. 2151.413(D)(1) instructs agencies to file for the permanent custody of a child that has been in the agency's temporary custody for 12 months of a 22-month consecutive period. However, the agency may not file for permanent custody of a child, who would otherwise fall under this section: "If reasonable efforts to return the child to the child's home are required under section 2151.419 of the Revised Code, the agency has not provided the services required by the case plan to the parents of the child or the child to ensure the safe return of the child to the child's home." R.C. 2151.413(D)(3)(b).

{¶ 34} We disagree with the parent's argument that R.C. 2151.413(D)(3)(b) requires agencies to use "reasonable efforts" in the same sense that "reasonable efforts" are required under R.C. 2151.419. Instead, R.C. 2151.413(D)(3)(b) provides that if a "12 of 22" case would otherwise require the agency to undertake reasonable efforts pursuant to R.C. 2151.419, then the filing of the permanent custody motion is precluded *unless* the agency has "*provided the services required by the case plan* to the parents of the child or the child to

ensure the safe return of the child to the child's home." Therefore, the inquiry under R.C. 2151.413(D)(3)(b) is whether the agency provided the services *specified* in the case plan. The limited nature of the inquiry provided by R.C. 2151.413(D)(3)(b) is demonstrated by contrasting it to the broader scope of the "cannot or should not" be placed with parents permanent custody element under R.C. 2151.414(E)(1) ("notwithstanding *reasonable case planning and diligent efforts by the agency* * * * the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home"). (Emphasis added.) While the scope of the "reasonable efforts" inquiry referred to in R.C. 2151.414(E)(1) may extend beyond the services set forth in the case plan, the scope of the R.C. 2151.413(D)(3)(b) inquiry does not.

{¶ 35} The case plan prepared by the agency and adopted by the juvenile court contained several changes the parents must implement and services the agency would provide to the family. In regards to J.H. and E.H., the case plan discussed the children's serious developmental delays and required their caregivers to ensure that the children attend all necessary therapy sessions. The case plan was revised several times while the children were in the agency's custody. Parents have not argued and this court has not found that the agency did not provide any of the services enumerated in the case plan to the family.

{¶ 36} Mother and father maintain that the agency failed to make "reasonable efforts" because it did not incorporate therapeutic intervention for the children to mitigate the regressive behaviors and traumatic reactions they displayed after visiting with the parents. However, while the case plan was revised throughout the case and despite the inclusive nature of case planning, at no point did parents exercise their statutory right to have the case plan amended to include therapeutic intervention to facilitate a resumption of visitation. *See* R.C. 2151.412(E); R.C. 2151.412(F)(2). Mother and father do not point to, and our review of the record does not reflect, an informal request to modify the case plan. Moreover, mother

and father were provided copies of the case plan throughout the agency's involvement with the family, however, the parents never indicated disagreement with any element of the case plans. Consequently, we find that prior to filing for permanent custody, the agency provided the services required by the case plan to the parents and the children pursuant to R.C. 2151.413(D)(3)(b).

{¶ 37} The juvenile court made the reasonable efforts determinations required by R.C. 2151.419, parents did not challenge those determinations, the evidence supports the juvenile court's reasonable efforts findings, and parents did not seek any amendment to the case plan, formally or otherwise, to include the therapeutic intervention they claim was necessary. Further, the agency complied with R.C. 2151.413(D)(3)(b) and provided the services required by the case plan.

### Statutory Standards in R.C. 2151.41

{¶ 38} The parents also make a number of arguments pertaining to the termination of their custody rights. Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *Id.* Second, the court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. R.C. 2151.414(B)(1)(a)-(e). If a child satisfies the "12 of 22"

requirement, an agency is not required to prove that a child cannot be returned to the parents within a reasonable time or should not be returned to the parents. *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, ¶ 21. In fact, such a requirement is inapplicable where "12 of 22" applies pursuant to the plain language of the statute.

{¶ 39} In this case, the juvenile court considered the statutory factors and found, by clear and convincing evidence, that J.H. and E.H. had been in the temporary custody of the agency for more than 12 months of a consecutive 22-month period as of the date the agency filed for permanent custody and that the children cannot be placed with either parent within a reasonable time. The juvenile court also found that granting permanent custody to the agency was in the children's best interest.

{¶ 40} Mother challenges the juvenile court's finding that J.H. and E.H. cannot be placed with either parent within a reasonable time. However, we do not need to address this argument because the juvenile court also found that J.H. and E.H. have been in the agency's custody for 12 months out of a consecutive 22-month period. *In re L.J.*, 12th Dist. Warren No. CA2014-10-124, 2015-Ohio-1567, ¶ 24. The evidence supports this finding. At the time of the filing of the permanent custody motion on November 20, 2014, J.H. and E.H. had been in the agency's custody since they were removed from their parents on July 1, 2013. The children were adjudicated neglected on August 26, 2014. "[A] child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." R.C. 2151.414(B)(1). Therefore, the children were considered to have been in the custody of the agency since August 26, 2013, the date of adjudication and for more than 12 months as of the time of the filing of the motion for permanent custody.

{¶ 41} Father argues that granting permanent custody to the agency was not in the

best interest of the children as he has completed the case plan and remedied the conditions which created the need for removal. In a best interest analysis under R.C. 2151.414(D)(1), the juvenile court must consider all relevant factors to a grant of permanent custody, including five enumerated factors. *C.F.*, 2007-Ohio-1104 at ¶ 57. Among the "best interest factors" enumerated in the statute are: (1) the child's interaction and interrelationship with his parents, foster caregivers, and others who may significantly affect the child; (2) the child's wishes, expressed either directly to the court or through a guardian ad litem; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether such a placement is attainable without granting permanent custody. R.C. 2151.414(D)(1)(a)-(d). No one factor is to be given greater weight or heightened significance in the juvenile court's analysis. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

{¶ 42} After reviewing the entire record, weighing inferences, and examining the credibility of witnesses, we find that sufficient credible evidence existed to support the juvenile court's determination that granting permanent custody to the agency was in the best interest of J.H. and E.H. With respect to the children's interactions and interrelationships, the foster parents testified that E.H. and J.H. have a good relationship with each other and play well together. The evidence also demonstrated that the children have a loving relationship with their foster families and a troubled relationship with mother and father. Dr. Kennedy testified E.H. and J.H. have trouble forming attachments, have no attachments to mother and father, but have developed attachments to their respective foster families. Multiple witnesses testified that E.H. and J.H. have severe reactions after spending time with mother and father but these regressive behaviors virtually disappeared after visitations were suspended. Moreover, while Dr. Kennedy recognized that the regressive behaviors could have been caused from the prolonged separation from their parents, he opined that the best environment for the children was to stay with their current foster families. In this regard, we

acknowledge Dr. Kennedy's testimony that the suspension of visitation was detrimental to reunification. However, this testimony is not reflective of an opinion that suspension of visitation was not warranted.

{¶ 43} With respect to the children's wishes, at the time of the permanent custody hearing, J.H. and E.H. were largely non-verbal and were too young to express their wishes. However, the guardian ad litem recommended that the motion for permanent custody be granted.

{¶ 44} Regarding their custodial history, the children were removed from the parent's custody in July 2013. J.H. and E.H. have remained with their current foster family since the fall of 2013.

{¶ 45} The evidence also demonstrated the children are in need of a legally secure placement and this can only be achieved by granting the agency permanent custody. Mother was diagnosed with chronic persistent depression, characterized by feelings of hopelessness and helplessness. The agency was previously involved with the family in the spring of 2013 and the family was making good progress. However, one month after the agency ceased involvement, the situation deteriorated to the point where the children had to be removed. Dr. Kennedy testified that while mother and father can provide for the children's needs right now, the reintroduction of the full parenting relationship is likely to result in "catastrophic levels of stress" and will probably collapse. Dr. Kennedy opined that mother and father will probably not have the resources to deal with their own mental illnesses as well as care for two developmentally delayed children. Dr. Kennedy expressed the opinion that reunification, at best, was a long term proposition. In this regard, we note that, as of the conclusion of the hearing on the motion for permanent custody, the children had been in the agency's temporary custody for 22 months. Pursuant to R.C. 2151.415(D)(4) it is provided that "the court shall not order an existing temporary custody order to continue beyond two years after

the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier." Therefore, extension of temporary custody was not a viable option and there were no other realistic custodial alternatives before the juvenile court.

{¶ 46} Further, the evidence at the permanent custody hearing demonstrated that since E.H. and J.H. have been in the care of their foster families, each child has made significant progress in school, speech therapy, and behavioral goals. The children are progressing in potty-training, are no longer afraid of bathing, have stopped babbling, and are able to speak a few words and phrases. The children's temper tantrums have also decreased. Additionally, both children's foster families expressed a willingness to adopt the children if permanent custody was granted to the agency.

{¶ 47} Although not enumerated as a best interest factor in R.C. 2151.414(D), parental completion of case plan services is a relevant factor in determining a child's best interest in a permanent custody case. In this regard, we recognize mother's and father's hard work in completing the case plan by obtaining clean and stable housing, gaining employment, and attending mental health services. However, "the case plan is 'simply a means to a goal, but not the goal itself'." *In re E.B.*, 12th Dist. Warren No. CA2009-10-139, 2010-Ohio-1122, ¶ 30, quoting *In re C.C.*, 8th Dist. Cuyahoga Nos. 94013 and 94014, 2010-Ohio-780, ¶ 25. The various other best interest factors in this case supporting an award of permanent custody to the agency outweigh the parents' completion of the case plan as a factor supporting reunification.

{¶ 48} In light of all the facts and circumstances presented in this case, we find that the juvenile court's grant of permanent custody of E.H. and J.H. to the agency was in the children's best interest and was supported by sufficient, credible evidence.

{¶ 49} Mother's first assignment of error and father's second assignment of error are overruled.

{¶ 50} Father's Assignment of Error No. 1:

{¶ 51} THE TRIAL COURT ABUSED ITS DISCRETION PROCEDURALLY DURING THE PERMANENT CUSTODY HEARINGS, CONSTITUTING PREJUDICIAL ERROR.

{¶ 52} Mother's Assignment of Error No. 2:

{¶ 53} THE TRIAL COURT ERRED IN DENYING THE MOTHER'S MOTION FOR APPOINTMENT OF A CHILD PSYCHOLOGIST FOR EXPERT EVALUATION AND EXPERT TESTIMONY.

{¶ 54} Mother and father both challenge the appointment of Dr. Kennedy as an independent psychiatric expert. Mother argues error occurred when the court refused to appoint mother her own psychiatric expert. Father maintains the juvenile court erred in restricting contact between Dr. Kennedy and counsel for mother and father. Father also argues the juvenile court erred when it allowed and relied upon facts that were already litigated at the initial adjudicatory and disposition hearing to be introduced at the permanent custody hearing.

**Appointment of Psychiatric Expert**

{¶ 55} Parents have a fundamental interest in the care, custody, and management of their children. *Santosky*, 455 U.S. at 753. Thus, when the state initiates proceedings to deprive parents of custody of their child, the parents must be provided with fundamentally fair procedures in accordance with the due process guarantees of the Fourteenth Amendment of the United States Constitution and Section 16, Article I, of the Ohio Constitution. *Id*.; *In re Hockstock*, 98 Ohio St.3d 238, 2002-Ohio-7208, ¶ 16.

{¶ 56} When the state seeks to permanently terminate a parent-child relationship, due process may require the appointment of a psychiatric expert for an indigent parent. *In re Shaeffer*, 85 Ohio App.3d 683 (3d Dist.1993). A psychiatric expert to testify regarding a

parent's mental health issues must be appointed when "the indigent parent's mental or emotional health was clearly the predominant issue from the outset and ultimately became the determinative issue * * *." *Id.* at 691. Courts have reasoned that a psychiatric expert must be appointed because "the risk of erroneous deprivation is a serious one and the merits of the proposed procedural safeguard [of appointing a psychiatric expert] are significant. * * * [T]he state's interest in economic and administrative efficiency [is] comparatively weak and the prospective additional burden * * * relatively slight." *Id.*, citing *Mathews v. Eldridge*, 424 U.S. 319, 334-335, 96 S.Ct. 893 (1976).

**{¶ 57}** In the case at bar, mother and father, individually, filed motions to the juvenile court to appoint an expert in child psychology. Both parents requested the expert to evaluate the children and provide expert testimony regarding the children's trauma responses, however, mother also requested an expert to testify regarding her mental health and assist in preparing her defense. At the time of the filing of the motions, it was clear that the agency would use J.H.'s therapist, Mike Phillips, to provide expert testimony regarding the regressive behaviors of the children at the permanent custody hearing. The juvenile court granted father's motion, denied mother's motion, and appointed Dr. Kennedy. The juvenile court explained Dr. Kennedy would evaluate mother, father, and the children and his testimony would be to determine the best interests of the children as opposed to supporting either the parents or the agency.

**{¶ 58}** At the end of the hearing, the juvenile court clarified the interaction with Dr. Kennedy. The court explained that interaction with Dr. Kennedy would be "done in the regular course," the agency would provide Dr. Kennedy the children's social history, and further contact with the doctor would be through the guardian ad litem. The court also stated that counsel may not contact Dr. Kennedy because his appointment is to determine the best interest of the children and may or may not benefit either side's case. After Dr. Kennedy

completed his examinations and submitted his report to the court, the state subpoenaed and spoke with him about his testimony at the permanent custody hearing.

{¶ 59} We find that the juvenile court did not violate the due process rights of mother and father in its appointment of Dr. Kennedy. The juvenile court's decision to grant father's motion and appoint one expert to render an opinion as to the psychiatric concerns of mother, father, and the children adequately balanced mother's and father's fundamental rights with the state's interest in the efficient and economic administration of the proceedings. Dr. Kennedy was chosen by father, conducted clinical interviews of each parent and the children, submitted a detailed report, and provided testimony regarding his expert evaluation of the family and the best interest of the children

{¶ 60} The juvenile court's appointment of Dr. Kennedy as an independent expert was an attempt to elicit further guidance on the two major issues in this case: mother's mental illness and the behaviors of the children. In light of the fact that the testimony of the state's expert witness, Mike Phillips, was limited to the regressive behaviors of J.H. and E.H. and did not render an opinion regarding the effect of mother's mental illness in her ability to parent the children, we find the juvenile court did not violate the due process rights of mother and father. *See In re Elliott*, 6th Dist. Jefferson Nos. 03JE30 and 03JE33, 2004-Ohio-388, ¶ 26-28 (due process violation when refused to appoint mother forensic psychologist when state had forensic psychologist expert to testify regarding mother's mental health).

{¶ 61} We also do not find that the juvenile court's guidelines regarding interaction with Dr. Kennedy violated mother's and father's due process rights. The juvenile court's guidelines regarding interaction with Dr. Kennedy was an attempt to ensure the doctor would remain independent. The court limited the contact of all counsel – not just the parents' counsel – with Dr. Kennedy. The juvenile court had the discretion to manage contact with the psychiatric expert prior to the hearing and the court's orders limiting contact did not abuse

that discretion. *See Silver v. Jewish Home of Cincinnati*, 190 Ohio App.3d 549, 2010-Ohio-5314, ¶ 21 (12th Dist.). Dr. Kennedy's direct contact with the parents afforded them the opportunity to provide their perspectives, and we assume the parents' attorneys consulted with them prior to their meeting with Dr. Kennedy. The juvenile court did not restrict contact between counsel for the parties and Dr. Kennedy once his evaluations were completed and his report was submitted. Consequently, the juvenile court did not violate the due process rights of mother and father in its appointment and subsequent orders restricting contact with Dr. Kennedy.

### Readjudication of Abuse, Neglect, Dependency

{¶ 62} R.C. 2151.414(A)(1) provides that "[t]he adjudication that the child is an abused, neglected, or dependent child * * * shall not be readjudicated at the [permanent custody] hearing and shall not be affected by a denial of the motion for permanent custody." The prohibition in R.C. 2151.414(A)(1) against the readjudication of neglect and dependency does not preclude the court from considering evidence elicited in the dependency hearing at a permanent custody hearing. *In re Cavender*, 12th Dist. Madison No. CA2000-06-037, 2001 WL 277245, *9 (Mar. 19, 2001). Instead, "the prohibition is merely an attempt to emphasize that the outcome of the permanent custody hearing has no effect on the prior adjudication of neglect or the prior order of temporary custody, meaning that the parent cannot 'erase' past findings of neglect by defeating the agency's motion for permanent custody." *In re Nice*, 141 Ohio App.3d 445, 454 (7th Dist.2001). In fact, courts are instructed in permanent custody hearings to consider "all relevant factors." R.C. 2151.414(D).

{¶ 63} In its decision granting permanent custody to the agency, the juvenile court mentioned facts that were elicited at the initial adjudicatory and disposition hearing. The court mentioned that J.H. and E.H. were removed from "deplorable conditions," their surroundings included "bugs and feces on them and through the home in addition to dirt and

filth and bed bugs," and the parents had locked the boys in a room while they smoked marijuana. However, the prohibition in R.C. 2151.414(A)(1) against the readjudication of neglect and dependency does not preclude the court from considering the evidence elicited in dependency or neglect hearings. The juvenile court could consider evidence produced at these hearings without engaging in the "readjudication" prohibited by R.C. 2151.414(A)(1). Therefore, the juvenile court did not err in mentioning these facts in its decision granting permanent custody to the agency.

{¶ 64} Mother's second assignment of error is overruled. Father's first assignment of error is overruled.

{¶ 65} Judgment affirmed.

HENDRICKSON and PIPER, JJ., concur.