[Cite as *In re E.W.*, 2018-Ohio-3992.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | CASE NO. CA2018-06-010 |
| E.W. | : | O P I N I O N<br>10/1/2018 |
| | : | |
| | : | |

APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. AND20160054

Jess C. Weade, Fayette County Prosecuting Attorney, Sean M. Abbott, 110 East Court Street, Washington C.H., Ohio 43160, for appellee

Melissa S. Upthegrove, 254 East Court Street, Washington C.H., Ohio 43160, for appellant, mother

**M. POWELL, J.**

{¶ 1} Appellant ("Mother"), biological mother of the minor child E.W., appeals the decision of the Fayette County Common Pleas Court, Juvenile Division, which granted permanent custody of E.W. to Fayette County Department of Job & Family Services, Children Services ("JFS" or "the agency"). For the reasons described below this court affirms the juvenile court's decision.

{¶ 2} In February 2016, the agency filed a complaint alleging that E.W., age two, was a neglected and dependent child. The complaint arose after police located E.W.'s older

sibling unsupervised and several blocks from home. The complaint alleged that Mother, who had a prior history with children services, made no attempt to locate the missing sibling. The sibling claimed that Mother had physically abused her. E.W., who was with Mother, was found to be "filthy" by an agency caseworker. Police charged Mother with endangering children. The agency requested temporary custody, which the court granted the same day.[1]

{¶ 3} The agency and Mother entered into a case plan with the goal of reunification. Mother was required to take parenting classes, complete a mental health assessment, and follow all recommendations.[2]

{¶ 4} Mother later stipulated that E.W. was dependent and the agency dismissed the neglect allegation. The court found E.W. dependent and ordered that temporary custody remain with the agency. Mother was allowed weekly two-hour visits with E.W. at a visitation center.

{¶ 5} Mother completed parenting classes. However, Mother made minimal progress on all other aspects of the case plan for the next year and one-half. Mother began relationships with several men who had criminal histories or drug abuse issues, some of whom may have resided in the home or been allowed in the home. In May 2017, Mother's caseworker was not able to visit the home as Mother would not answer the door.

{¶ 6} The agency began to suspect that Mother was using illegal narcotics. The agency attempted several times to obtain a urine sample from Mother for a drug screen. Mother told the caseworker she could not provide a urine sample because of a medical condition and that she urinated only once a day, and only at night.

---

1. E.W.'s siblings were also removed and eventually placed in the legal custody of their father, who is not E.W.'s father.

2. E.W.'s biological father, who lived at a separate residence, also entered into a case plan for reunification. The father had two visits with the child then ceased all involvement in the case. The juvenile court found that the father abandoned the child. The father has not appealed, and Mother does not challenge the juvenile court's finding that E.W.'s biological father abandoned her.

{¶ 7} Based on these concerns, in July 2017, the agency and Mother entered into an amended case plan, which required Mother to remain drug free, to have a drug and alcohol assessment completed, to follow its recommendations, and to take and pass all drug screens requested by the agency.

{¶ 8} The agency directed Mother to Fayette Recovery Center to begin these case plan requirements. However, Mother did not go to her initially scheduled appointment.

{¶ 9} Mother's two-hour visits with E.W. were reduced to an hour at the request of the agency. The agency requested the change because of E.W.'s behavior during the visits and Mother's inability to control E.W. Mother agreed to the change.

{¶ 10} In August 2017, Mother met once with a psychologist. The psychologist diagnosed Mother with bipolar disorder and "cannabis abuse." Recommended treatment involved outpatient counseling and telemedicine sessions with a psychiatric nurse. Mother attended no further counseling sessions in 2017 but completed three telemedicine sessions in August and November of 2017 and January 2018.

{¶ 11} In the fall of 2017, Mother began living with a new boyfriend. The agency requested that the boyfriend submit to fingerprinting and BCI and FBI background checks. The boyfriend did not submit to background checks at that time.

{¶ 12} By November 2017, Mother still had not submitted to a drug screen, but admitted daily marijuana use to her caseworker. In December 2017, Mother submitted to her first drug screens, which were positive for THC and cocaine.

{¶ 13} In February 2018, two years after removal, the agency moved for permanent custody. The agency alleged that E.W.'s father abandoned her, that E.W. had been in the agency's temporary custody for 12 of the previous 22 months, and that granting permanent custody to the agency was in E.W.'s best interest.

{¶ 14} Following the agency's motion, Mother attended two counseling sessions with

her psychologist. Mother also completed four out of seven scheduled drug and alcohol counseling sessions. Finally, Mother submitted to two drug tests, one, an announced test, which she passed, and the other which the agency considered invalid because the urine sample she presented to the caseworker was cold. Mother's boyfriend submitted to a background check around the end of March 2018.

{¶ 15} E.W.'s guardian ad litem (GAL) filed a report indicating that Mother was non-compliant with the case plan in multiple respects and that despite numerous attempts, the GAL had only been able to access Mother's home once during the pendency of the case. The GAL recommended that the court grant permanent custody to the agency.

{¶ 16} The juvenile court held the permanent custody hearing in April 2018. A caseworker testified concerning Mother's lack of progress on the agency's case plan, the agency's concerns with Mother's admitted drug use, Mother's failure to complete drug and alcohol counseling, the agency's inability to test Mother for drugs on multiple occasions, and concerns with the people Mother lived with and dated. The caseworker testified that Mother had six child endangering convictions and did not have legal custody of her other five children. The agency attempted to place E.W. but found no family member or person willing to accept her.

{¶ 17} The GAL testified that she attempted to visit Mother's home five or six times during the two-year pendency of the case but gained entry only once, one week prior to the permanent custody hearing. There were no serious concerns with the home. During the GAL's unsuccessful attempts to visit the home, she observed cars parked at the home and would knock on the door but receive no response. In one instance, she observed the front curtain being drawn as she approached the door. The GAL knocked but received no response. The GAL observed Mother's visits with E.W. and described them as "fine."

{¶ 18} Mother called her psychologist, Dr. Susan Wolfe, to testify. Dr. Wolfe had

treated Mother since she was a teenager. Dr. Wolfe met with Mother four times during the pendency of the case. They had no meetings in 2016, met once in 2017, and met three times in 2018. Dr. Wolfe testified that Mother seemed "more stable" in her last meeting.

{¶ 19} Two visitation employees testified about Mother's visits with E.W. Neither had concerns.

{¶ 20} Mother testified that she had not smoked marijuana since January 2018. She had not worked during the pendency of the case and received approximately $700 per month in social security benefits. Mother claimed that she may have been in a "craft" shed behind the house during the GAL's unsuccessful attempts to visit the home and that a dog possibly moved the curtain.

{¶ 21} The foster parents reported to the court that E.W. was doing well living with them. Everyone at the foster parents' church loved E.W. and E.W. loved going to church and singing. E.W. liked spending time with her foster grandparents, who lived behind her foster parents. E.W. has "cousins" who come over to the house and play with her. E.W. has children her own age with whom to play. She had some behavioral issues but was showing improvement.

{¶ 22} The court issued a decision finding by clear and convincing evidence that granting permanent custody to JFS was in E.W.'s best interest. Mother appeals, raising one assignment of error.

{¶ 23} Assignment of Error No. 1:

{¶ 24} THE TRIAL COURT'S DECISION AND ORDER GRANTING PERMANENT CUSTODY OF E.W. TO FAYETTE COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES WAS CONTRARY TO THE BEST INTEREST OF THE CHILDREN, AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND THERE WAS INSUFFICIENT CLEAR AND CONVINCING EVIDENCE TO SUPPORT ITS DECISION.

{¶ 25} Mother argues that the court erred in granting permanent custody to JFS because she was partially compliant with the case plan, maintained appropriate housing, and regularly visited with E.W. and there were no serious concerns with her behavior during visits.

{¶ 26} Before a natural parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove, by clear and convincing evidence, that the statutory standards for permanent custody have been met. *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982); R.C. 2151.414(B)(1). An appellate court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re J.H.,* 12th Dist. Clinton Nos. CA2015-07-014 and CA2015-07-015, 2016-Ohio-640, ¶ 21.

{¶ 27} Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if the court makes findings pursuant to a two-part test. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). Second, the court must find that any of the following apply: (1) the child is abandoned, (2) the child is orphaned, (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. R.C. 2151.414(B)(1)(a)-(e). Only one of those findings must be met to satisfy the second prong of the permanent custody test. *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-

Ohio-2896, ¶ 22.

{¶ 28} In this case, the juvenile court found by clear and convincing evidence that E.W. had been in the agency's temporary custody for at least 12 months of a consecutive 22-month period. Mother does not dispute this finding. Rather, Mother disputes that granting permanent custody of E.W. to the agency was in E.W.'s best interest.

{¶ 29} R.C. 2151.414(D)(1) sets forth the statutory best-interest factors:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 30} In granting JFS' motion for permanent custody, the juvenile court considered each of the best interest factors. With respect to the first statutory factor, the court found that Mother visited with E.W. regularly and those visits went "fairly" well. There was no evidence admitted with respect to E.W.'s interactions with any of her siblings. The foster parents reported on E.W.'s positive interactions with family, fellow church members, and children her age.

{¶ 31} In considering the second factor, the court found that E.W. was too young to

express her wishes. The GAL recommended that the court grant permanent custody to the agency.

{¶ 32} As to the third statutory factor, the court found that E.W. had been in the temporary custody of the agency for two years.

{¶ 33} With respect to the fourth statutory factor, the court found that E.W. needed a legally secure placement, which could not be achieved without a grant of permanent custody to the agency. In this regard, the court observed that Mother had made some progress on the case plan but otherwise demonstrated a lack of urgency to complete the case plan. Mother did not work on the main components of the case plan for over a year after removal. The majority of Mother's efforts towards reunification came two years after removal and after the agency moved for permanent custody.

{¶ 34} The court further observed that Mother failed to comply with her requirement to submit to drug screens and admitted continued use of marijuana. Mother had questionable persons residing in her home during the pendency of the case. These people had criminal histories or issues with drug abuse. As a result, Mother's visits with E.W. could never progress to in-home visits. The agency requested that Mother's live-in boyfriend submit to a background check in the fall of 2017. He did not do so until a week prior to the permanent custody hearing.

{¶ 35} With respect to the final statutory factor, the court further found that Mother had six convictions for endangering children.

{¶ 36} Based on these findings, the juvenile court found by clear and convincing evidence that a grant of permanent custody to JFS was in E.W.'s best interest. After a thorough review of the record, we find that the juvenile court's determination regarding E.W.'s best interest is supported by sufficient credible evidence.

{¶ 37} The juvenile court and agency allowed Mother two years to remedy the issues

- 8 -

that led to E.W.'s removal. However, Mother only began demonstrating consistent progress on the case plan and genuine interest in reunification after the agency moved for permanent custody. Mother's home was deemed appropriate, but she did not make it readily available for inspection. The GAL first gained access to the home only a week prior to the permanent custody hearing. Mother's visits went well but Mother took no meaningful steps to allow visits to occur outside the visitation center. E.W. needs permanency and cannot and should not wait until Mother is able to resolve her issues and make reunification with E.W. a priority.

{¶ 38} This court agrees that a grant of permanent custody to the agency, where E.W. can be adopted by a family that can provide for the child's basic needs, is the only viable solution. Moreover, there were no other dispositional alternatives available to the juvenile court. An order extending temporary custody pursuant to R.C. 2151.415(A)(6) was not an available dispositional alternative, as R.C. 2151.415(D)(4) prohibits an extension of temporary custody beyond two years after the filing of the February 2016 dependency complaint. An order for a planned permanent living arrangement pursuant to R.C. 2151.415(A)(5) was not an available dispositional alternative, as E.W. was not yet 16 years old as required by R.C. 2151.415(C)(1). An order placing E.W. in the legal custody of a relative or other interested individual was not an available dispositional alternative as no such person filed a motion requesting legal custody or was identified in the complaint or a motion as a proposed legal custodian as provided by R.C. 2151.353(A)(3). Finally, orders that E.W. be returned to the custody of Mother or her biological father or placed into the protective supervision of either parent pursuant to R.C. 2151.415(A)(1) and (2), respectively, were practically unavailable because, as discussed above, Mother failed to remedy the barriers to reunification with E.W. and E.W.'s father abandoned her. Consequently, this court overrules Mother's assignment of error.

{¶ **39**} Judgment affirmed.

S. POWELL, P.J., and PIPER, J., concur.