[Cite as *In re T.L.*, 2018-Ohio-138.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

IN RE: T.L.                                    :
                                                       CASE NOS. CA2017-07-037
                                               :                        CA2017-07-038

                                               :              O P I N I O N
                                                                  1/16/2018
                                               :

                                               :


APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 2015JC4724


Scott A. Hoberg, 9146 Cincinnati-Columbus Road, West Chester, Ohio 45069, for appellant A.L.

Suellen M. Brafford, 285 East Main Street, Batavia, Ohio 45103, for appellant, M.L.

D. Vincent Faris, Clermont County Prosecuting Attorney, Nicholas Horton, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for Clermont County Department of Job & Family Services


        **M. POWELL, J.**

        {¶ 1} A.L. and M.L. ("Mother" and "Father" respectively or "parents" collectively) appeal the decision of the Clermont County Juvenile Court, which granted permanent custody of their son, T.L., to the Clermont County Department of Job and Family Services. For the reasons discussed below, this court affirms the decision of the juvenile court.

**{¶ 2}** In October 2014, the Clermont County Department of Job and Family Services ("JFS" or "the agency") established an unofficial case concerning T.L. The unofficial case was intended to address risks to T.L.'s health, safety and welfare, based upon the parents' substance abuse and incidents of domestic violence between the parents. In December 2014, the agency closed this unofficial case after Mother and Father agreed to transfer custody of T.L. to a family friend. However, one month later the friend informed JFS that she could no longer care for T.L. because Mother and Father were threatening her. As a result, in January 2015, JFS filed a complaint alleging that T.L., then almost five years old, was a dependent child. The court held an emergency hearing and placed T.L. in the temporary custody of JFS. The agency thereafter placed T.L. in a foster home.

**{¶ 3}** The agency initiated a case plan with the goal of reunifying Mother and Father with T.L. The plan required Mother and Father to receive substance abuse counseling and treatment. The case plan further required Mother and Father to attend parenting classes and complete anger management and counseling with respect to their issues with domestic violence. In addition, Mother and Father were required to obtain stable income and safe and stable housing for T.L. The case plan provided Mother and Father with weekly supervised visits with T.L.

**{¶ 4}** In April 2015, the court adjudicated T.L. a dependent child. Following a June 2015 dispositional hearing, the court continued temporary custody with the agency. The court twice extended temporary custody with the agency.

**{¶ 5}** In August 2016, JFS moved for permanent custody, alleging that T.L. had been in its custody for 12 or more months of a consecutive 22-month period, that T.L. could not or should not be placed with either of his parents within a reasonable time, and that it was in T.L.'s best interest that the court grant the agency permanent custody. T.L.'s guardian ad litem ("GAL") filed a written report recommending that the court grant

permanent custody to JFS.

{¶ 6}  In January 2017, the court held the permanent custody hearing.  A JFS caseworker testified that beginning in October 2014 and through December 2014, Mother and Father had several incidents of domestic violence, which their children witnessed.[1] Father was drunk during these incidents.  Following these incidents, Mother and Father voluntarily transferred custody of T.L. to a family friend in December 2014.[2]

{¶ 7}  With respect to Mother's progress in her case plan, the caseworker testified that Mother completed those aspects of her case plan related to substance abuse.  Mother sporadically attended specified therapy/counselling sessions related to mental health and domestic violence concerns, missing seven appointments.  The service provider rated mother's progress as a 6 or 7 on a scale of 10.

{¶ 8}  Mother never satisfied the stable income component of the case plan.  She briefly obtained employment in November 2016, which ended the same month.  Otherwise, Mother was unemployed throughout the case.

{¶ 9}  The case plan specified that Father engage in a substance abuse assessment and comply with any resulting recommendations.  In furtherance of this requirement, the agency referred Father to a substance abuse recovery center in January 2015.  However, father did not begin the program and the recovery center closed his case.

{¶ 10}  Approximately 14 months later, in March 2016, Father completed an alcohol assessment at a behavioral health center.  However, contrary to the recommendation for treatment arising from the assessment, Father failed to return to the health center for another four months and reported ongoing alcohol use during this time.  In August 2016,

---

1. Mother and Father have four other children.  These children were transferred to a different family friend and are not involved in this case.

2. The record is unclear as to whether Mother and Father formally transferred legal custody to the friend.

over a year and a half after the case began, father began an inpatient alcohol abuse program. Father completed the two-week program and reported to the caseworker that he had remained sober since. Father's recommendations upon leaving the inpatient program were to engage an Alcoholics Anonymous ("AA") sponsor within two weeks and attend 90 AA sessions in 3 months and to follow up with the behavioral health center. Notwithstanding these recommendations, Father failed to obtain a sponsor and attended only five AA sessions. The behavioral health center closed Father's case for non-compliance the next month. In November 2016, Father re-engaged with the behavioral health center and began counseling services on both substance abuse and mental health/domestic violence issues.

{¶ 11} With respect to his income, Father worked in 2016 for a power company and earned around $3,000. He was unemployed at the time of the permanent custody hearing, but had submitted two job applications. He told the caseworker that he did not have enough gas money to drive around and look for employment.

{¶ 12} Despite the case plan requirement that Mother and Father obtain and maintain stable housing, they were unable or unwilling to do so. When the case began, Mother and Father were living in various friends' homes. In the summer of 2015, they moved to the home of Father's mother and aunt. The home is a small trailer located in Cynthiana, Kentucky. The trailer has two bedrooms and a small living room area. The trailer has no dedicated heat source. Instead, the occupants were using an oven and space heaters.

{¶ 13} Beginning in June 2015, the caseworker visited the trailer every other month to inspect its condition. Both bedrooms were filled with boxes and were uninhabitable. However, two days before the permanent custody hearing, the caseworker observed that one bedroom had been cleared and a bed was placed there for T.L. The caseworker reported that this was the only improvement to the property that she had observed since

she began visiting the home.

{¶ 14} Because the trailer was in Kentucky, it was necessary that a Kentucky agency conduct the home study. The home study did not begin until shortly before the permanent custody hearing. The caseworker had previously cautioned Mother and Father that if they intended to reside in Kentucky, an interstate home study would be required and would involve additional time for completion. However, Mother and Father informed the caseworker that they intended to move back to Ohio and obtain independent housing.

{¶ 15} The home study was not finalized by the time of the permanent custody hearing. However, the Kentucky social worker who conducted the home study reported concerns with the trailer. Additionally, the worker reported that there were five vicious dogs housed outside the property, one of which bit her as she was concluding a home visit.

{¶ 16} Mother and Father were dependent upon Father's mother and aunt for support during the time they resided at the trailer. Father's mother also told the caseworker that she did not intend to continue supporting Mother and Father financially.

{¶ 17} The caseworker testified that Mother and Father applied for food stamps shortly before the permanent custody hearing and would be receiving $357 per month in food assistance income. The caseworker testified that the agency had provided Mother and Father with $1,340 in gas cards, which was an "extremely high" amount relative to other cases. Mother and Father informed the agency that they could not have traveled from Kentucky to visit T.L. without this assistance.

{¶ 18} With respect to visitation, both Mother and Father did well. Mother exercised 93 out of 100 visits. Father exercised 69 out of 100 visits. However, many of Father's missed visits were related to his being out of town for work. Father would still call in during the missed visits so he could speak with T.L. The visits went well and it was clear that T.L. and his parents were bonded.

{¶ 19} Mother and Father both completed an initial round of parenting classes. However, the agency would not permit them to continue taking parenting classes until they completed other unresolved aspects of their case plan.

{¶ 20} Ultimately, the caseworker testified that many of the same barriers for reunification existed at the permanent custody hearing as did when the case began. Specifically, the agency was concerned that Mother and Father lacked income and suitable housing. In addition, neither parent had finished their case plan requirements and Father had just recently resumed working towards completing his case plan with respect to substance abuse and domestic violence issues.

{¶ 21} The caseworker testified that the agency placed T.L. in a foster home upon removal and he remained there until late December 2016. The foster family was unwilling to pursue adoption, so the agency moved T.L. to a new foster home where he was "doing great," was engaged in family Christmas activities, and "felt like part of the family."

{¶ 22} The GAL testified that she had been assigned to the case since T.L.'s removal. With respect to T.L.'s wishes, T.L. liked his new foster home and would like to stay with the foster family. However, T.L. would also be "okay" if the court decided to send him to live with his parents. The GAL recommended that the court grant permanent custody to the agency. The GAL noted that Father's mother indicated that she did not want T.L. living with them in the trailer.

{¶ 23} Father testified that he had been sober since he completed the inpatient program in August 2016. Father did not attend AA meetings because he thought it was only a recommendation and felt he did not need to attend AA if he did not believe it would be helpful. With respect to his housing situation, Father said that the family had just been approved for 200 gallons of kerosene the day before the permanent custody hearing. Father conceded that he had four other children but could not see them because the

children's caregiver had a restraining order against him.

{¶ 24} Mother did not testify or call any witnesses. A magistrate issued a decision recommending that the court grant permanent custody to the agency. Mother and Father filed objections to the magistrate's decision. In July 2017, the court issued an order overruling the objections and awarding permanent custody to the agency. Mother and Father appeal, each raising one assignment of error for our review.

{¶ 25} Mother's Assignment of Error:

{¶ 26} IN A CHILD CUSTODY CASE, THE TRIAL COURT ERRED IN ITS DECISION AND ORDER GRANTING PERMANENT CUSTODY OF THE CHILD TO THE AGENCY DESPITE THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 27} Father's Assignment of Error:

{¶ 28} THE TRIAL COURT ERRED WHEN IT GRANTED PERMANENT CUSTODY TO CLERMONT COUNTY JOB AND FAMILY SERVICES "AGENCY[.]"

{¶ 29} Mother and Father present similar arguments, which we address together. Mother and Father contend that the evidence at the permanent custody hearing did not support the conclusion that a grant of permanent custody to the agency was in T.L.'s best interest. Instead, the evidence established that Mother and Father exercised visitations with T.L., were bonded with their child, and T.L. expressed a desire to live with his parents. Father argues that the evidence showed that he sought employment, completed some aspects of his case plan, and was currently engaged in counseling. Mother contends that the evidence with respect to the suitability of the parents' housing situation in Kentucky was inconsistent and was not based on a completed interstate home study.

{¶ 30} Before natural parents' constitutionally protected liberty interest in the care and custody of their child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met.

- 7 -

*Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982); R.C. 2151.414(B)(1). An appellate court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re J.H.*, 12th Dist. Clinton Nos. CA2015-07-014 and CA2015-07-015, 2016-Ohio-640, ¶ 21.

{¶ 31} Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if the court makes findings pursuant to a two-part test. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). Second, the court must find that any of the following apply: (1) the child is abandoned, (2) the child is orphaned, (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. R.C. 2151.414(B)(1)(a)-(e). Only one of those findings must be met to satisfy the second prong of the permanent custody test. *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 22.

{¶ 32} In this case, the juvenile court found by clear and convincing evidence that T.L. had been in the agency's temporary custody for 12 or more months of a consecutive 22-month period. Mother and Father do not dispute this finding. Rather, T.L.'s parents dispute that granting permanent custody of T.L. to the agency was in T.L.'s best interest.

{¶ 33} R.C. 2151.414(D)(1) sets forth the statutory best-interest factors:

[T]he court shall consider all relevant factors, including, but not

limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 34}   In granting JFS' motion for permanent custody, the juvenile court considered each of the best interest factors.  With respect to the first statutory factor, the juvenile court found that Mother and Father were bonded with T.L. and visited him on a regular basis, with Mother visiting T.L. 93 times and Father visiting 69 times.  There was no evidence concerning T.L.'s relationship with his four siblings.  T.L. was currently in a license-to-adopt foster home and the foster parents had no other foster children in the home.  The caseworker reported that T.L. was doing well and was happy with his new foster family.  The foster family engaged T.L. in Christmas activities.  The foster family may be interested in adopting T.L.

{¶ 35}   As to the second statutory factor, the juvenile court found that T.L. wanted to stay with his current foster family but would be "okay" with being returned to his parents.  The GAL recommended that the court grant permanent custody to the agency because Mother and Father had not demonstrated that they could provide for T.L.'s basic needs.

**{¶ 36}** In consideration of the third statutory factor, the juvenile court found that T.L. had been in the agency's custody since January 2015 and the agency moved for permanent custody in August 2016. Consequently, the court found that T.L. had been in the agency's custody for 12 or more months of a consecutive 22-month period.

**{¶ 37}** With respect to the fourth factor, i.e., T.L.'s need for a legally secure placement, the court found that Mother and Father were unable to establish a safe home for the child. Mother's and Father's current residence was a small trailer that had no habitable bedroom until shortly before the hearing. Mother and Father slept in an extension to the trailer while Father's mother and aunt slept on couches in the living room. While an interstate home study had not been completed by the time of the hearing, the Kentucky caseworker's observations were not encouraging, as the trailer was heated only by space heaters and an oven and there were vicious dogs outside of the trailer. In addition, Father's mother was reluctant to have T.L. live with them and was concerned about supporting the parents and the child on a permanent basis.

**{¶ 38}** The court observed that Mother and Father have a history of failing to address issues until the last moment. As an example, the court noted that the parents waited until just prior to the permanent custody hearing to prepare a room at the trailer suitable for T.L. Except for Mother's success with the substance abuse portion of her case plan, neither parent demonstrated an ability to make a lasting change for T.L.'s benefit.

**{¶ 39}** The court noted that neither parent could support themselves financially over the two-year pendency of the case. Father received unemployment compensation but his benefits ended when he failed to file the necessary paperwork. The court noted that this failure demonstrated Father's lack of commitment to becoming self-sufficient or making a lasting change. The court found that neither parent had shown any prospect of being able to meet T.L.'s basic needs.

**{¶ 40}** The juvenile court observed that no appropriate relative was available to care for the child. The child's paternal aunt had expressed a desire but was on probation for a felony conviction for assaulting a police officer, and thus the agency determined she was not suitable. Finally, the court found that none of the factors listed in R.C. 2151.414(E)(7) through (11) were applicable.

**{¶ 41}** Based on these findings, the juvenile court found by clear and convincing evidence that it was in T.L.'s best interest to grant permanent custody to JFS. After a thorough review of the record, we find that the juvenile court's determination regarding T.L.'s best interest is supported by sufficient credible evidence.

**{¶ 42}** Father argues that he made some progress on his case plan objectives, including regularly visiting with T.L. However, in the two years this case was pending Father made no progress on achieving stability with respect to his income or safe, suitable housing. Accordingly, we reject Father's argument that the best-interest factors weighed towards granting him custody. We also reject Mother's argument that the evidence concerning the trailer was inconsistent or was not properly demonstrated through a finalized interstate home study. Mother did not object to the caseworker's testimony concerning the incomplete home study. And the caseworker consistently testified as to the home's condition, i.e., that it was heated only by space heaters and an oven.

**{¶ 43}** T.L. needs permanency and cannot and should not wait until his parents are able to resolve their issues. A grant of permanent custody to the agency, where T.L. can be adopted by a family that can provide for his basic needs, is the only viable solution. Moreover, there were no other dispositional alternatives available to the juvenile court. An order extending temporary custody pursuant to R.C. 2151.415(A)(6) was not an available dispositional alternative, as R.C. 2151.415(D)(4) prohibits an extension of temporary custody beyond two years after the filing of the January 2015 dependency complaint. An

order for a planned permanent living arrangement pursuant to R.C. 2151.415(A)(5) was not an available dispositional alternative, as T.L. was not yet 16 years old as required by R.C. 2151.415(C)(1). An order placing T.L. in the legal custody of a relative or other interested individual was not an available dispositional alternative as no such person filed a motion requesting legal custody or was identified in the complaint or a motion as a proposed legal custodian as provided by R.C. 2151.353(A)(3). Finally, orders that T.L. be returned to the custody of a parent or placed into the protective supervision of a parent pursuant to R.C. 2151.415(A)(1) and (2), respectively, were practically unavailable because, as discussed above, Mother and Father failed to remedy the barriers to reunification with T.L. Mother and Father's assignments of error are overruled.

{¶ 44} Judgment affirmed.

S. POWELL, P.J., and RINGLAND, J., concur.