[Cite as *In re N.W.*, 2018-Ohio-4559.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| IN THE MATTER OF: | : | CASE NOS. CA2018-06-126 |
|  |  | CA2018-06-127 |
| N.W., et al. | : | CA2018-06-132 |
|  |  | CA2018-06-133 |
|  | : | CA2018-07-138 |
|  |  | CA2018-07-139 |
|  | : |  |
|  |  | O P I N I O N |
|  | : | 11/13/2018 |
|  | : |  |


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. JN2015-0095 & JN2015-0096


Michael T. Gmoser, Butler County Prosecuting Attorney, Michael Greer, Government Services Center, 315 High Street, 11th Floor, Hamilton, OH 45011, for appellee

Kim Bui, 8080 Beckett Center Drive, Suite 112, West Chester, OH 45069, for appellant, mother

Garrett Law Offices, Dawn S. Garrett, 9435 Waterstone Blvd., Suite 140, Mason, OH 45249, for appellant, father

Legal Aid Society of Southwest Ohio, LLC, Lindsey DiCesare, 10 Journal Square, 3rd Floor, Hamilton, OH 45011, for appellants, T.W. and N.W.


**M. POWELL, J.**

{¶ 1} Appellants, Mother, Father, and their biological children, T.W., and N.W., appeal the decisions of the Butler County Court of Common Pleas, Juvenile Division, which granted permanent custody of T.W. and N.W. to appellee, Butler County Children Services.

For the reasons discussed below, this court affirms the juvenile court's decisions.

{¶ 2} In April 2015, Butler County Children Services ("BCCS" or "the agency") filed a complaint alleging that T.W., then age 12, and N.W., then age 9, were abused and dependent children. The complaint alleged that BCCS caseworkers interviewed the children, who described, in detail, observing Father prepare and administer intravenous narcotics to himself and friends. Father admitted a heroin addiction to an agency caseworker and requested treatment.

{¶ 3} The complaint further alleged that Father had a history of substance abuse, theft, and domestic violence charges. He was also in violation of the terms of his probation. Mother had previously lost custody of the children to Father in 2013. That earlier custody case was initiated because of Mother's and Father's substance abuse issues. Father alleged that Mother was currently abusing heroin.

{¶ 4} The court held an emergency ex parte hearing and issued an order granting the agency temporary custody of the children. The agency placed the children in foster care. Shortly after the children's removal, Father was incarcerated for the probation violation.

{¶ 5} Mother and the agency entered into a case plan for reunification. The case plan required Mother to submit to substance abuse and mental health assessments and follow recommendations arising from the assessments. Upon completion of the assessments, it was recommended that Mother complete an intensive outpatient program for substance abuse, engage in therapeutic mental health services and psychological counseling, maintain sobriety, and provide a safe and stable environment for the children.

{¶ 6} In July 2015, the court adjudicated the children dependent and continued temporary custody with the agency. In August 2015, BCCS referred Mother to the intensive outpatient program that had been recommended pursuant to her substance abuse

assessment. Mother began the program but did not complete it because of various rules infractions. The agency then referred Mother for residential drug treatment.

{¶ 7} Mother entered residential treatment and was compliant. She tested negative on drug screens. Over the next year, Mother progressed on other aspects of her case plan.

{¶ 8} Father's incarceration concluded in January 2016. He contacted the agency and sought to participate in the case plan for reunification. However, Father relapsed within several weeks of his release. He began residing in a sober-living facility and did well, maintaining his sobriety for several months.

{¶ 9} Mother failed a drug test in June 2016. She began a relationship with a man who was physically abusive. Mother's behavior at visits and during telephone conversations with the children was concerning to visitation center workers. For instance, during visitations, Mother was observed "nodding off" or displaying other odd behaviors.

{¶ 10} Then in July 2016, Father relapsed for a second time. He voluntarily entered substance abuse treatment. In September 2016, the court ordered an extension of temporary custody with the agency for an additional six months. In October 2016, with little progress made towards reunification by either parent, the agency moved for permanent custody. Father relapsed for a third time at the beginning of 2017.

{¶ 11} Both children were adamant that they wished for the family to reunify.[1] In February 2017, by agreement of all the parties, the permanent custody motion was continued to allow Mother and Father additional time to achieve reunification. Mother and the children began participating in the agency's Family Preservation Program. The program allowed Mother and the children supervised visitations outside the visitation center.

{¶ 12} Father remained in a sober-living facility. He was working and generally doing

---

1. For this reason, the court appointed the children a separate attorney and guardian ad litem.

well maintaining his sobriety. However, the agency would not permit the children to visit with Father at the sober-living facility. If Father wished to exercise visitation with the children outside of the visitation center, it was necessary that he obtain an independent residence. The agency offered to help Father obtain an apartment. He declined and remained in the sober-living facility.

{¶ 13} By June 2017, Mother continued to demonstrate progress on her case plan such that the agency asked the court to again delay the hearing on permanent custody and place the children in Mother's temporary custody. The court agreed and the children went to live with Mother at the children's maternal grandmother's house in Eaton, Ohio.

{¶ 14} In July 2017, Father relapsed for the fourth time. He voluntarily entered substance abuse treatment at a residential treatment facility in Toledo, Ohio. However, he left the facility after several weeks without having completed the treatment program.

{¶ 15} Father then began a relationship with a woman who lived in Aurora, Indiana. Approximately one month later, Father began residing in the woman's rented home with her two teenage sons. Father delayed providing the agency with the woman's information and the agency could not initiate a timely interstate home study. Nonetheless, a BCCS caseworker visited the home and determined there was insufficient room for T.W. and N.W. During this time, Father repeatedly tested positive for T.H.C.

{¶ 16} The children remained in Mother's care over the summer of 2017. Caseworkers from the Family Preservation Program monitored the custody arrangement through weekly visits. Numerous issues caused the caseworkers to be concerned with the children's well-being and Mother's mental health. Ultimately, Preble County law enforcement were dispatched to the residence upon an allegation that Mother had assaulted T.W. Upon arrival at the scene, police found T.W. in the bathroom holding a kitchen knife. T.W. told police he was tired of Mother hitting him and throwing him around.

Mother was arrested.

{¶ 17} The juvenile court removed the children from Mother's temporary custody and returned the children to the agency's temporary custody. The court issued a no-contact order between Mother and the children.

{¶ 18} The children's guardian ad litem ("GAL") filed a written report recommending that the court grant the agency permanent custody. The court held the permanent custody hearing over four days in January 2018.

{¶ 19} The agency introduced testimony from its caseworkers, the children's mental health professionals, and a foster parent. Father testified and introduced the testimony of the woman he was living with and visitation center employees. Mother testified. The court conducted an in-camera interview with the children.

{¶ 20} The court issued a decision granting permanent custody of the children to the agency. Mother, Father, and the children appeal, each raising a single assignment of error, which this court addresses collectively.

{¶ 21} Mother's Assignment of Error:

{¶ 22} THE TRIAL COURT'S DECISION AND ORDER GRANTING PERMANENT CUSTODY WAS NOT SUPPORTED BY SUFFICIENT, CREDIBLE EVIDENCE AND WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 23} Father's Assignment of Error:

{¶ 24} THE GRANT OF PERMANENT CUSTODY WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE THAT IT WAS IN THE CHILDREN'S BEST INTEREST AND WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 25} Children's Assignment of Error:

{¶ 26} THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN APPLYING O.R.C § 2151.414(D)(1).

{¶ 27} Mother argues that the evidence established that reunification could be achieved in a reasonable time because she actively participated in and nearly completed her case plan services. Father and the children contend that the children's best interests would be better served by granting Father custody because Father completed the most crucial case plan services, addressed and remedied his issues with substance abuse, established a stable living situation and employment, and the children are bonded with him and wish to return to his care. Father further argues that the court erred in granting permanent custody where the agency did not file an adoption plan and when neither child was likely to be adopted.

{¶ 28} Before natural parents' constitutionally protected liberty interest in the care and custody of their children may be terminated, the state is required to prove, by clear and convincing evidence, that the statutory standards for permanent custody have been met. *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982); R.C. 2151.414(B)(1). An appellate court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re J.H.*, 12th Dist. Clinton Nos. CA2015-07-014 and CA2015-07-015, 2016-Ohio-640, ¶ 21.

{¶ 29} Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if the court makes findings pursuant to a two-part test. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D)(1). Second, the court must find that any of the following apply: (1) the child is abandoned, (2) the child is orphaned, (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or

should not be placed with either parent, or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. R.C. 2151.414(B)(1)(a)-(e). Only one of those findings must be met to satisfy the second prong of the permanent custody test. *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 22.

{¶ 30} The parties do not challenge the juvenile court's finding that the children were in the agency's temporary custody for at least 12 months of a consecutive 22-month period. Accordingly, this court will review whether sufficient credible evidence exists to support the juvenile court's decision that a grant of permanent custody to the agency was in the children's best interest.

{¶ 31} R.C. 2151.414(D)(1) sets forth the statutory best-interest factors:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 32} In granting BCCS' motion for permanent custody, the juvenile court considered each of the relevant best interest factors. Addressing the first statutory factor,

the juvenile court found that the children resided with Father prior to their initial removal. After removal, Father exercised supervised visitation. Father's visits were observed to be positive and appropriate and Father engaged well with the children, who were bonded with their Father and happy to see him.

{¶ 33} However, Father exercised his visitation inconsistently. He did not visit the children during the time he was incarcerated or on the multiple occasions he relapsed. As a result, he lost visitation rights three times.

{¶ 34} Mother was more consistent with visitation and the children were placed in her temporary custody over the summer of 2017. However, Mother was incarcerated for domestic violence for assaulting T.W., was issued a no-contact order, and had no further interaction with the children since the incident. The children had a tenuous relationship with Mother, which seemed to improve by the time Mother received temporary custody. But as of the hearing on permanent custody, the children did not want to reunify with Mother.

{¶ 35} The juvenile court noted that the children were bonded with one another but that they were not placed together at one child's request. T.W. experienced various placements during the pendency of the case but was doing well in his current placement. T.W. appeared relatively stable and happy. N.W. had been with the same placement for most of the case, before and after his removal from Mother's temporary custody. N.W.'s foster mother could not state whether the family would adopt, primarily because N.W. said he did not want to be adopted. Nonetheless, the foster mother testified to a close bond with N.W.

{¶ 36} With regard to the second statutory factor, the juvenile court noted that it conducted in camera interviews with the children and had taken their wishes and concerns into consideration. The court had also considered the children's attorney's indication that the children wished to be returned to Father's custody, but not Mother's. Finally, the juvenile

- 8 -

court noted that it considered the GAL's recommendation to grant permanent custody to the agency.

{¶ 37} With respect to the third statutory factor, the court found by clear and convincing evidence that the children had been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period, i.e., the children had been in the agency's custody for approximately 29 months.

{¶ 38} Concerning the fourth statutory factor, the court found that both children needed a legally secure permanent placement that could not be achieved without a grant of permanent custody to the agency. The court noted that the agency's greatest concern with Father was his history of abusing narcotics and its greatest concerns with Mother was her mental health. Both parents also had a history of domestic violence and had been convicted of domestic violence. The children had earlier been removed from their parents' custody and a prior custody case had eventually resulted in Father receiving legal custody after he had completed substance abuse treatment services and received negative drug screenings.

{¶ 39} But this case began because Father was again abusing heroin and causing trauma to his children by exposing them to his substance abuse. Father acknowledged his use of heroin but never admitted using it in front of his children, which was concerning to the juvenile court.

{¶ 40} The juvenile court found that the children have their own serious mental health concerns. T.W. was hospitalized shortly after removal for suicidal and homicidal ideation. N.W. was hospitalized within two weeks following removal for suicidal ideation. Both were in therapy for trauma they have experienced while being raised by Mother and Father.

{¶ 41} The court found that the agency developed a case plan for reunification with both parents but because of a lack of progress towards remedying the issues that led to

removal, the agency moved for permanent custody in October 2016. The permanent custody hearing was scheduled to begin in February 2017. However, all parties agreed to delay the hearing to attempt reunification with Father. Father relapsed shortly thereafter.

{¶ 42} The agency then shifted its focus to reunification with Mother. The children were eventually placed in Mother's temporary custody. That placement failed as the children had to be removed from Mother's custody because of domestic violence.

{¶ 43} Mother and Father had been ordered to complete various services throughout the pendency of the case. Despite participating in some of those services, the court noted that the parents had failed to alleviate the agency's concerns and had not established that the children could be safely returned to their custody. Father completed some substance abuse treatment while incarcerated. But he relapsed within several weeks of his release. Father began living at a sober-living facility. He did well there but was reluctant to leave and establish an independent home where the children could live with him because he feared relapsing.

{¶ 44} Following Father's second relapse, BCCS referred Father for substance abuse treatment and mental health services. Father failed to engage those services and relapsed a third time.

{¶ 45} In July 2017, Father relapsed for the fourth time and entered a residential treatment program in Toledo, Ohio. A BCCS caseworker was scheduled to meet with Father and drove to Toledo. When the caseworker arrived, she was informed that Father had left the facility prior to completing the program.

{¶ 46} Since leaving that treatment program, Father had been using and testing positive for T.H.C. He refused to enter another substance abuse treatment program as ordered. Father claimed to be attending A.A. and N.A. group meetings but admitted he did not have a sponsor or home group. Father admitted regular marijuana use and admitted

using marijuana a week before the permanent custody hearing.

{¶ 47} Father's companion testified that she did not believe that Father was using marijuana around her children. However, Father testified that he would ingest marijuana at night when the woman would leave the home to begin her work shift and when Father was entrusted with the care of her children. Father used marijuana to deal with the stress in his life.

{¶ 48} Father never participated in mental health treatment as ordered. Father testified that he did not believe in taking psychiatric medications but testified to using marijuana to deal with his stressors. Father failed to appreciate that marijuana is an illicit drug.

{¶ 49} Father had various employments during the pendency of the case. However, Father never maintained suitable housing. He had resided in jail, at a friend's house, at two different sober-living facilities, a residential treatment center, and the woman's rented home. Father had only known his companion for one month before moving into her home. An interstate home study was never performed on the home because of Father's delay in providing the caseworker with the woman's information. A BCCS worker did travel to the home and observed that it lacked space for any additional children.

{¶ 50} With regard to Mother's participation in the case plan, the court found that the agency referred Mother for substance abuse treatment and continued mental health treatment. Mother completed residential substance abuse treatment in November 2015 and was referred to intensive outpatient treatment, which she never completed.

{¶ 51} The agency referred Mother to parenting classes and she completed them approximately one year after the children's initial removal. Upon completion of the parenting classes, the organization that administered the class had ongoing concerns with Mother's ability to appropriately parent the children. Mother's mental health issues interfered with

her ability to remain focused on the parenting lessons.

{¶ 52} Mother exercised visitation but exhibited concerning behavior and speech, including nodding on and off during visitations, sudden fast paced movements and speech, cycling into slurred speech, and picking at sores. Mother often had difficulty responding to the children during their visits, especially when the children would display negative behaviors. Yet other times Mother's visitations with the children went well.

{¶ 53} When Mother had temporary custody of the children while participating in the agency's Family Preservation Program, a caseworker's observations led to serious concerns about Mother's mental health and ability to parent the children. The caseworker observed the steadily deteriorating condition of the home over the course of the summer. Prescription medicines were observed lying around the home, both inside and outside the bottle. The caseworker tried to get Mother to create a daily schedule for food preparation and prescription drug medications. Mother claimed to have created a schedule but never produced it. Mother took T.W. "dumpster diving" late at night and had to be ordered by the court not to engage in that activity.

{¶ 54} Mother falsely claimed that the children's maternal grandmother had stolen her food assistance benefits. Mother failed to enroll the children in school, despite many weeks to prepare for enrollment. Mother permitted N.W. to use electronics although she was advised not to do so by N.W.'s medical providers. Finally, Mother was discharged from the Family Preservation Program after she was incarcerated for domestic violence against T.W. Accordingly, the court found that the agency's ongoing concerns with Mother's numerous mental health issues were justified.

{¶ 55} The court also reviewed Mother's residential history during the pendency of the case and found that she had not maintained stable housing. She lived with a boyfriend who physically abused her. The agency regularly offered to assist Mother to leave that

home and enter a battered woman's shelter. But Mother refused the offer for financial reasons, despite the court having ordered no contact between the children and the abuser. Mother moved in to her mother's home, where the children lived with her until the second removal. After removal, Mother was incarcerated in two counties, then she lived for a few weeks in a hotel, in a homeless shelter, in an apartment determined to be uninhabitable, and by the time of permanent custody hearing, in an elderly friend's apartment. The court also found that Mother had not maintained stable employment.

{¶ 56} The court reviewed the mental health issues and needs of the children. The court noted that both children's mental health issues were the result of their parents' instability. T.W. had numerous hospitalizations during the case for engaging in self-harming behaviors. His desire to harm himself occurred when he was worried about or angry at his parents. T.W. did poorly, physically and psychologically, when placed with Mother. T.W.'s therapist testified that Mother was physically abusing T.W. and that T.W. regressed in his therapy when returned to her custody.

{¶ 57} N.W., prior to the first removal in this case, had already been diagnosed with major depressive disorder. N.W.'s treatment provider described him as a "survivor" who had been exposed to domestic violence and parental drug use. The court found that both children had suffered disruptions for most of their lives due to their parents' issues.

{¶ 58} With respect to foster placements, the court found that T.W. was doing "exceptionally well" in his current foster home and had developed a bond with his foster parent and extended family. N.W. was also doing well in his foster placement and had a bond with his foster mother. However, N.W.'s reunification with Mother had regressed him significantly. Both children now had no desire to have contact with Mother but wished to reunify with Father.

{¶ 59} The juvenile court found that both children had serious mental health issues

- 13 -

and would need a parent equipped to ensure that their medical and therapeutic needs were met. The court determined that Father was not capable of providing for those needs. Father had been ordered to ensure that his own mental health needs were addressed but failed to do so. He failed to attend counseling as ordered. He failed to acknowledge the extent of his issues with substance abuse and continued to use an illicit narcotic as a method to deal with the stressors in his life, as opposed to dealing with his stress in an appropriate way. Moreover, the court noted that Father voluntarily chose to move out of Ohio, had no approved interstate home study performed at his new residence, and had never introduced his companion and her two children to his children. The court found that it had significant concerns if the children were placed in Father's custody. Accordingly, the court found by clear and convincing evidence that neither parent had successfully addressed the issues that caused the children's removal.

{¶ 60} After a thorough review of the record, this court concludes that sufficient credible evidence exists in the record to support the juvenile court's determination that it was in the children's best interest to grant permanent custody to the agency. With respect to Mother, her severe mental health issues and history of domestic violence prevented her from providing a safe and stable living environment for her children. Nonetheless, she argues that the evidence established that she could reunify with the children within a reasonable time.

{¶ 61} The court's finding that the children could not be placed with Mother within a reasonable time or should not be placed with her was supported by overwhelming evidence establishing the severity of Mother's mental health issues. For example, Mother testified during the permanent custody hearing that parasites were eating her from the inside out. In this regard, Mother's therapeutic records indicate that she was preserving her own bodily waste, including feces and scabs, to demonstrate the existence of the parasites to her

- 14 -

medical providers.

{¶ 62} Mother also she testified that she had been diagnosed with bone cancer during the case. There was no other evidence to support this claim and Mother could not identify the doctor who diagnosed her. Mother claimed that she received no cancer treatment because the illness was so advanced. But then she claimed to have been miraculously cured.

{¶ 63} With respect to Father, he is clearly bonded with the children and the children love him and would like nothing more than to live with him in a safe and stable living situation free of fear, parental drug abuse, and domestic violence. However, while Father acted appropriately during visitations, he did little else to demonstrate an actual motivation to reunify with his children. Father did not establish that he remedied his issues with substance abuse. He relapsed into heroin use four times during the pendency of the case. Following his final relapse, Father began using marijuana, which he admitted he used to deal with his stressors. Father further admitted he used marijuana when his companion entrusted him to watch her children while she was away. Despite his serious addiction issues, Father displayed a nonchalant attitude towards substance abuse treatment. He testified that he did not need counseling, a sponsor, or support groups because he knew how to manage his own recovery.

{¶ 64} Father also rejected the agency's attempts to assist him in moving into suitable housing. Instead, he decided to remain in a sober-living facility, where the children could not reside with him. When Father finally did obtain a residence potentially suitable for the children, it had insufficient space and the other residents of the home had not met the children. Ultimately, Father demonstrated through his actions and inactions that his focus in life was on himself and not reunification with his children.

{¶ 65} Father also argues that R.C. 2151.413(E) required BCCS to file an adoption

plan before the court could grant permanent custody and cites several cases from the Second District Court of Appeals.[2] *In re R.G.*, 2d Dist. Montgomery No. 22482, 2008-Ohio-2895, *rev'd*, 120 Ohio St.3d 359, 2008-Ohio-6694; and *In re T.R.*, 2d Dist. Montgomery No. 22291, 2007-Ohio-6593, *rev'd*, 120 Ohio St.3d 136, 2008-Ohio-5219. However, the Ohio Supreme Court reversed both cases, holding that an adoption plan did not need to be filed before a court could grant a permanent custody motion. *T.R.*, 2008-Ohio-5219 at the syllabus. Father also argues that the evidence did not support the conclusion that either child was likely to be adopted. While this court agrees that both children face difficulties in finding permanency because of their serious mental health issues, a grant of permanent custody to the agency still gives each child a greater chance at stability and permanency than a return to the dysfunction and chaos associated with living with Mother and Father.

{¶ 66} Therefore, this court agrees that a grant of permanent custody to the agency, where the children have the possibility of being adopted by a family that can provide for their needs, is the only viable solution. Moreover, there were no other dispositional alternatives available to the juvenile court. Orders extending temporary custody pursuant to R.C. 2151.415(A)(6) were not an available dispositional alternative, as R.C. 2151.415(D)(4) prohibits an extension of temporary custody beyond two years after the filing of the April 2015 dependency complaints. Orders for a planned permanent living arrangement pursuant to R.C. 2151.415(A)(5) for the children were not an available dispositional alternative, as neither child was 16 years old as required by R.C. 2151.415(C)(1). Orders placing the children in the legal custody of a relative or other interested individual was not an available dispositional alternative as no such person filed

---

2. The requirement that the agency set forth a plan for adoption applies when moving for permanent custody pursuant to R.C. 2151.413. But the same requirement is not set forth in permanent custody proceedings brought under R.C. 2151.415. The permanent custody motions filed in this case do not specify which section of the Revised Code the agency relied upon in moving for permanent custody.

a motion requesting legal custody or was identified in the complaint or a motion as a proposed legal custodian as provided by R.C. 2151.353(A)(3). Finally, orders that the children be returned to the custody of Mother or Father or placed into the protective supervision of either parent pursuant to R.C. 2151.415(A)(1) and (2), respectively, were practically unavailable because, as discussed above, the parents failed to remedy the barriers to reunification with the children. Consequently, this court overrules Mother's, Father's, and the children's assignments of error.

{¶ 67} Judgment affirmed.

RINGLAND, P.J., and PIPER, J., concur.